OPINION OF THE COURT
Simons, J.
Defendant has been convicted, upon his guilty plea, of criminal possession of a controlled substance in the first degree (Penal Law § 220.21 [1]). On this appeal he challenges on several grounds the validity of a search warrant authorizing the search of his house and the seizure of various items of physical evidence, including approximately two pounds of cocaine found during the course of the search.
I
While investigating a drug ring involving the importation and distribution of cocaine in the Finger Lakes region, the State Police obtained authorization to place a wiretap on the *498 phone of one Hector Carbuccia, a known cocaine distributor operating at the middle level of the local drug distribution chain. By means of the wiretap, they intercepted coded conversations between Carbuccia and defendant suggestive of drug activity. Consequently, on June 15, 1984 the Ontario County District Attorney sought an eavesdropping warrant for defendant’s telephone.
The application in support of the eavesdropping warrant contained over 200 pages. Included in it was an affidavit from State Police Investigator William Freeman, who was the director of the area-wide drug investigation and an officer with substantial experience in drug enforcement. In his affidavit he summarized the results of the investigation and he attached to it several exhibits, including the results of a pen register surveillance which showed that over 2,000 telephone calls of short duration had been placed to and from defendant’s residence over a one-month period of time. Defendant, who had prior drug-related arrests and convictions, had no known legitimate occupation and, according to Investigator Freeman, such phone call patterns were consistent with narcotics trafficking. The pen register results also revealed that defendant regularly conversed with other individuals identified as cocaine distributors by known police informants speaking from personal knowledge and against their penal interests. Another informant named defendant as a "marihuana and cocaine connection” for Canandaigua. Most significantly, the warrant application contained a detailed summary and verbatim passages of phone conversations between defendant and Hector Carbuccia. The conversations were "coded” in an attempt to disguise their purpose, but according to Investigator Freeman, who had listened to the calls, read the transcripts of them and translated the coded language used by defendant and his companions, the conversations related to the distribution of cocaine in the Finger Lakes region.
On the basis of this information, Ontario County Judge Frederic T. Henry, Jr., issued an order authorizing the police to tap defendant’s telephone. By means of the tap, State Police investigators intercepted several drug-related calls to and from defendant’s residence during the next 15 days.
On the morning of June 30, 1984, Freeman made an oral application to Judge Henry pursuant to CPL 690.36 to search the residence of Paul Callerame, one of defendant’s associates in drug distribution. He requested that the Judge "incorporate *499 by reference” all of the facts and circumstances contained in the 200-page application for the eavesdropping warrant issued 15 days earlier and he explained why he thought there was probable cause to search Callerame’s residence. Specifically, he offered his expert explanation of each of 19 coded telephone conversations involving defendant and his companions, supplying Judge Henry with verbatim quotations of the salient portions of 15 of them. These telephone conversations revealed that on June 25, 1984 codefendant Paul Callerame flew to Florida from Syracuse and purchased about 32 ounces of cocaine. While negotiating the cocaine transaction in Florida, Callerame called both his girlfriend Susan Kennedy and defendant in Canandaigua to advise them of details. After the purchase, Callerame called defendant and told him that it was "time to send the mailman”, meaning that it was time for codefendant A1 Sterling to drive down to Florida to pick up the cocaine and return to the Finger Lakes region with it by car. The intercepted communications also revealed that Sterling, under the direction of defendant, did indeed leave for Florida, that he made contact with Callerame in West Palm Beach, Florida, and that the two men left Florida at about the same time — Callerame by plane, Sterling by car. When the two codefendants returned to New York, they contacted defendant, who had been accepting orders for the resale of substantial quantities of cocaine to various other individuals farther down the drug chain while Sterling and Callerame were away. Sterling, Callerame and defendant arranged to meet on the morning of June 30, 1984 to cut and distribute the cocaine.
Freeman also supplied Judge Henry with details corroborating the activities discussed on these tapes. For example, he confirmed that Sterling had rented a car in Rochester on June 26 and that Callerame had flown to Florida from the Syracuse airport and subsequently returned there from Florida. In the course of their telephone conversation, Freeman also told Judge Henry that his surveillance team had seen defendant at Callerame’s residence on the morning of June 30, 1984. Freeman then read contents of the search warrant for Callerame’s residence to Judge Henry and the Judge authorized a no-knock warrant based upon all the information presented, including the information supplied to support the eavesdropping warrant "incorporated by reference” into the search warrant application.
Before the warrant could be executed, however, defendant and the codefendants left the Callerame residence and drove *500 to defendant’s residence in Canandaigua. Accordingly, Freeman called Judge Henry again at about 11:55 a.m. After being properly sworn, Freeman asked Judge Henry to incorporate by reference all of the information supplied during the two earlier warrant applications, and then proceeded to tell him why he believed that cocaine was now present at defendant’s residence. He referred the court to the June 28, 1984 conversation in which defendant told an individual named Peter Roth that he had IV2 ounces of cocaine at his residence and was waiting for the larger shipment to come in. Freeman also told Judge Henry that he believed that defendant had gone to the Callerame residence that morning to pick up a supply of the cocaine. Freeman read the contents of the warrant and Judge Henry issued a no-knock warrant for defendant’s residence.
That afternoon New York State Police officers executed the warrant and seized from defendant’s residence roughly two pounds of cocaine in numerous bags and containers as well as scales, dilutants, and other drug-related paraphernalia. Defendant was subsequently indicted for first degree possession of a controlled substance (Penal Law § 220.21 [1]) and when his motion to suppress the evidence seized pursuant to the search warrant was denied, he pleaded guilty.
II
Defendant has made several arguments in support of suppression but only four merit discussion.
A
Defendant contends first that the eavesdropping warrant issued by Judge Henry on June 15, 1984 was not supported by probable cause and, therefore, all evidence obtained by means of that warrant, either directly or indirectly, must be suppressed under the State and Federal Constitutions (NY Const, art I, § 12; US Const 4th Amend).
It is settled that the probable cause necessary for the issuance of an eavesdropping warrant is measured by the same standards used to determine whether probable cause exists for the issuance of a search warrant (People v Kaiser, 21 NY2d 86, 96, affd 394 US 280; People v Manuli, 104 AD2d 386, 387). As in the case of warrants generally, whether eavesdropping warrants are supported by probable cause is a mixed *501 question of law and fact and, therefore, this court is limited to reviewing the legal sufficiency of the evidence to determine whether the People have made the necessary minimum showing (see, People v Bigelow, 66 NY2d 417, 420-421; People v Johnson, 66 NY2d 398, 402; People v McRay, 51 NY2d 594, 601).
The record supports the finding of the courts below that there was sufficient evidence to support a finding of probable cause for the issuance of the eavesdropping warrant. First, there was the lawfully intercepted telephone calls between Carbuccia and defendant. The conversations were coded and, therefore, ambiguous but Investigator Freeman was an experienced drug officer and he interpreted the language used. His analysis was properly accepted because, as the courts below quite correctly recognized, "cryptic and ambiguous conversations may serve as a predicate for probable cause when reasonably interpreted by an experienced investigator” (People v Manuli, 104 AD2d 386, 388, supra; accord, People v Baris, 116 AD2d 174, 191; People v Germaine, 87 AD2d 848, 849; United States v Principie, 531 F2d 1132, 1138, cert denied 430 US 905). Moreover, review of the record supports the conclusion that Investigator Freeman’s interpretations of the telephone conversations were reasonable and they confirmed that defendant was probably a drug trafficker. In addition to these conversations, however, the results of pen register activity on defendant’s phone revealed that he had made several phone calls over a one-month period to three known drug dealers. Interpreting these affidavits and exhibits supporting the warrant application in a "commonsense and realistic fashion” (United States v Ventresca, 380 US 102, 108), rather than a "hypertechnical manner” (People v Hanlon, 36 NY2d 549, 559) and paying proper respect to the decision of the issuing Magistrate (see, People v Oden, 36 NY2d 382, 385; Aguilar v Texas, 378 US 108, 111), we cannot state as a matter of law that probable cause was lacking for the issuance of the eavesdropping warrant.
B
Defendant further contends that even if there were probable cause to support the issuance of the eavesdropping warrant, there was an insufficient basis upon which to authorize a search of his residence. Defendant focuses solely upon one item: Investigator Freeman’s statement to Judge Henry that *502 on the morning of June 30, 1984 police surveillance units had seen defendant drive to the Callerame residence, stay there for about 45 minutes and then return to his residence. He contends that this evidence is insufficient to support a finding of probable cause because the conduct observed "was innocuous and as consistent with innocence as with criminal activity” (see, People v Hansen, 38 NY2d 17, 20).
The Magistrate had a good deal more evidence before him, however, in the application for a warrant to search Paul Callerame’s residence and the application supporting surveillance of defendant’s telephone. Under the circumstances, he could incorporate this information into the new warrant application to support a finding of probable cause. Doing so facilitated law enforcement authorities in presenting the lull picture to him effectively and efficiently. The practice has been accepted by some departments of the Appellate Division (see, People v Baris, 116 AD2d 174, supra [4th Dept]; People v Rezey, 107 AD2d 850, 852 [3d Dept]; People v Davis, 93 AD2d 970 [3d Dept]; People v Germaine, 87 AD2d 848, 849, supra [2d Dept]) as well as in other jurisdictions (see, e.g., Commonwealth v Jordan, 397 Mass 494, 492 NE2d 351; Sims v State, 483 So 2d 81 [Fla App]), and in the Federal courts (see, United States v Serao, 367 F2d 347, 350, vacated on other grounds sub nom. Piccioli v United States, 390 US 202). We hold, therefore, that material previously submitted to a Judge may be incorporated by reference in a subsequent warrant application to him so long as the earlier information was given under oath, is either available to the Magistrate or sufficiently fresh in the Magistrate’s memory so that he or she can accurately assess it and it is available in a form which can be reviewed at a later date.
Based upon all the evidence properly before Judge Henry, it is apparent that the decisions of the courts below that the search warrant was based on probable cause has support in the record. First, the conversation between Peter Roth and defendant, intercepted just two days before the search, reveals that defendant had in his possession IVz ounces of cocaine and that he was awaiting the second shipment which would become available as soon as Sterling returned from Florida. Second, a call intercepted later on the afternoon of the 28th indicates that defendant had a motive to acquire a substantial amount of cocaine as soon as possible so that he could fill existing buy orders. The remaining calls between Kennedy, Callerame, Sterling and defendant permit *503 ted the reasonable conclusion that the purpose of the meeting at the Callerame residence on the morning of July 30 was to distribute cocaine recently acquired in Florida to meet this demand of defendant’s customers.
Defendant contends, however, that even if probable cause existed to search Callerame’s residence, there was none to establish that evidence of a crime could be found in his residence. This is so, he maintains, because, even if the intercepted conversations are considered, his visit to the Callerame residence could have been completely unrelated to drug activity. He points out that there is no evidence that he obtained cocaine when he visited Callerame’s residence or that after his visit he removed cocaine to his own residence. Whatever cocaine Callerame or Sterling acquired during their trip to Florida could have remained at the Callerame residence.
When the police have probable cause to believe that several individuals are involved in criminal activity and that evidence of the crime is likely to be in the possession of one of them but they lack the necessary information to make one of the perpetrators the most likely possessor of the evidence at a particular time, the law permits a Magistrate to make a finding of probable cause to search the places in the control of one or more of the associates in crime, even though it cannot be said that it is more probable than not that the cocaine will be found at one particular location (see, People v Hearty, 644 P2d 302 [Colo 1982]; Hooks v State, 416 A2d 189 [Del]; see also, United States v Melvin, 596 F2d 492, 497-498, cert denied 444 US 837; 1 LaFave, Search and Seizure § 3.2 [e], at 600-602 [2d ed]). The rule may be different where the fruits of the criminal enterprise are probably located in one of a few locations but the nature of the information is such that a search of each of these locations would intrude upon the rights of individuals in no way involved in the criminal activity under investigation (see, State v Morgan, 376 So 2d 99 [La]; State v Robinette, 270 NW2d 573 [SD]; cf., United States v Olt, 492 F2d 910). However, where each of the prospective places to search is controlled by someone involved in the criminal enterprise, "a magistrate need not determine that the evidence sought is in fact on the premises to be searched [citation omitted] or that the evidence is more likely than not to be found where the search takes place [citation omitted]. [He or she] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit” (United States v Peacock, *504 761 F2d 1313, 1315, cert denied 474 US 847). Inasmuch as the State Police had probable cause to believe that defendant and Callerame were engaged in illegal drug trafficking and that drugs could be found in either or both of their homes, the court properly issued a search warrant for defendant’s residence.
C
Defendant next contends that the evidence must be suppressed as a matter of law because Investigator Freeman made statements to the issuing Magistrate which he knew to be false or which he made with reckless disregard for their truth. Defendant’s claim is based upon Investigator Freeman’s mistaken report of 1 of the 19 separate telephone conversations in which defendant participated. The last of the intercepted conversations, identified as call "S”, took place on June 30 at 9:22 a.m., slightly more than two hours before Freeman made the application to search defendant’s residence. In explaining that call to Judge Henry, Freeman stated that defendant had called Paul Callerame and advised Callerame that Sterling would arrive at the Callerame residence in 45 minutes or less. A subsequent review of the transcript of call "S” reveals, however, that although defendant did call Callerame’s house, he did not speak directly with Callerame but spoke with Callerame’s girlfriend, Susan Kennedy. He gave her the information so that she could deliver the message to Callerame.
The burden of proving Freeman’s statement was knowingly false or made in reckless disregard of the truth rested on defendant and he failed to meet that burden (see, Franks v Delaware, 438 US 154, 171; People v Alfinito, 16 NY2d 181, 186). Several calls were made to Callerame’s residence on June 30 and a reading of the transcripts of them reveals that defendant did speak with Callerame and that a meeting of Sterling, Callerame and defendant was arranged for later that morning at Callerame’s residence. Investigator Freeman, working under the exigencies of the short time span between the interception of these calls and the application for the search warrant, apparently did not have a transcript before him and was relaying the information obtained from the various intercepted conversations to Judge Henry from memory. In doing so, he mistakenly described the conversation relating to the meeting on call "S” as between Callerame and *505 defendant. There was no reason to believe Freeman deliberately misled the court on the matter, however, because no benefit was to be gained by reporting that the conversation took place between defendant and Callerame rather than defendant and Kennedy. Whether defendant’s message about the meeting was delivered to Kennedy to relay to Callerame or to Callerame personally was of little consequence. Kennedy lived with Callerame and had knowledge of the drug importation and distribution network and consequently it would have been a reasonable assumption that she would deliver the message to Callerame in any event. The important fact was that the conversation gave probable cause to believe the drugs were in Callerame’s house and would be distributed among the parties to the transaction that morning. Thus, although Freeman’s statement about call "S” was inaccurate, it is of no legal consequence.
Even if the statement was knowingly false, however, the remedy is to delete the statement and review the sufficiency of the remaining evidence. When that is done and the conversation contained on call "S” is not considered, the warrant application contains sufficient evidence to support probable cause and suppression is not required (see, Franks v Delaware, 438 US 154, 171-172, supra; see also, People v Bartolomeo, 53 NY2d 225, 235).
D
Finally, defendant challenges the court’s procedure in ruling on the suppression motion.
Defendant’s omnibus motion to suppress the physical evidence and dismiss the indictment initially came before Ontario County Court Judge Reed. The People, relying on People v Romney (77 AD2d 482), requested him to transfer the motion to Judge Henry to determine defendant’s claims that probable cause was lacking for the issuance of the eavesdropping and search warrants. In Romney (supra), the Appellate Division, Fourth Department, held that a Judge of coordinate jurisdiction should not review the probable cause determination of an issuing Judge. Inasmuch as Judge Reed was bound by this decision, he granted the People’s application and transferred the probable cause determinations to Judge Henry. After Judge Henry concluded that probable cause existed for issuance of both the search warrant and the eavesdropping war *506 rant, he transferred the omnibus motion back to Judge Reed, who then ruled on the remainder of it.
In People v Guerra (65 NY2d 60, 63) we expressly rejected the limitation on review of suppression motions set forth in Romney. Our decision does not mandate reversal in this case, however, because although we held in Guerra that a Judge has the authority and right to rule on the propriety of a warrant issued by a Judge of coordinate jurisdiction, we did not hold that the issuing Judge lacks the power to review a warrant that he has issued, or even that he should avoid doing so (cf., People v Versace, 73 AD2d 304, 307). Nothing in the statute prevents the Judge issuing a warrant from entertaining a motion to suppress evidence seized pursuant to it (see, CPL 710.50 [1]; 700.05 [4]), and we see no reason for a rule prohibiting him from doing so. There is no basis to conclude that such Judges fail to give suppression motions anything less than fair and impartial consideration and further review is available by the Appellate Division which possesses the same power in such matters as does the suppression court (CPL 470.15).
Insofar as defendant’s argument is based on a theory that it was reversible error for Judge Reed to have transferred the proceeding, rather than because of anything done by Judge Henry, it must rest upon a showing of prejudice and none is made.
We have examined defendant’s remaining arguments and find them to be either unpreserved or without merit.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Kaye, Alexander, Hancock, Jr., and Bellacosa concur; Judge Titone taking no part.
Order affirmed.